NOT FOR PUBLICATION (Doc. Nos. 28, 32)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| PATRICIA L. CATULLO, | : |
| Plaintiff, | : |
| v. | Civil No. 09-3359 (RBK/KMW) |
|  | **OPINION** |
| LIBERTY MUTUAL GROUP, INC., and LIBERTY MUTUAL INSURANCE COMPANY, | : |
| Defendants. | : |

**KUGLER**, United States District Judge:

This age discrimination in employment case comes before the Court on the motion of Liberty Mutual Group, Inc. and Liberty Mutual Insurance Company ("Defendants" or "Liberty Mutual") for summary judgment on the claims of Patricia L. Catullo ("Plaintiff"). Also before the Court is Plaintiff's motion to seal certain documents filed with the Court in connection with her opposition to Defendants' summary judgment motion. Because Plaintiff has failed to present evidence of Defendants' alleged discriminatory animus, and has failed to present evidence of outrageous conduct by Defendants to support Plaintiff's claim of intentional infliction of emotional distress, Defendants' motion for summary judgment is granted. Furthermore, because Plaintiff has not made a particularized showing that the documents it seeks to seal should be closed to the public, Plaintiff's motion to seal is denied.

1

I.     BACKGROUND

Plaintiff began work for Liberty Mutual in 1998 as a "Claims Specialist III" in the Personal Injury Protection ("PIP") Litigation Group of Defendants' Marlton, New Jersey office. Dep. Patricia Catullo, Defs.' Br. in Support of Summ. J. ("Defs.' Br."), Ex. C.1, 38, 40.  Plaintiff was 48 years old at the time.  Id. at 8.  Two years later, Plaintiff was promoted to the position of Senior Claims Specialist I.  Id. at 40.  Plaintiff remained employed at this level until the end of her employment with Defendants.  Id.  Plaintiff was transferred from PIP Litigation to the PIP unit handling medical claims in 2006.  Id.  Plaintiff alleges that Lisa Kerns, a manager at Liberty Mutual, was responsible for Plaintiff's reassignment "without any cause" and "over Catullo's protest."  Compl. at ¶ 16.  Plaintiff alleges that the reassignment "was a less prestigious position" that afforded Plaintiff "less opportunity to advance," since the claims she encountered in the PIP unit were different from those with which she had developed a facility in the PIP Litigation group.  Id. at ¶ 17.

Plaintiff alleges that she was "denied opportunities to attend seminars" that younger employees received, and that she was not included in "team building opportunities" or "task teams" that were made available to younger workers.  Id. at ¶¶ 48-50.  In 2008, Plaintiff's desk was moved to an "extremely noisy" area where she was "isolate[d] from team members.  Id. at ¶ 51.  Plaintiff also alleges that employees younger than her were treated "more favorably" by Plaintiff's direct supervisor, Stanley Gorecki, whereas Plaintiff was "ostracized" and not included in social lunches with Mr. Gorecki and younger staff.  Id. ¶¶ 53-54.

Sometime shortly before November 13, 2008, a Liberty Mutual employee named Jen Bailey was suspected of improperly handling claims documents—specifically, placing documents that should have been put into claim files in the recycling and shredding bins instead.

Dep. Kerns, Defs.' Br., Ex. C.2, 159.  As a result, Ms. Kerns, in conjunction with another Liberty Mutual employee named Rose Salcedo, undertook an investigation of these bins, and determined that several employees may have been improperly discarding documents.  Id. at 159-60.  This incident is referred to as the "Iron Mountain incident" or the "Iron Mountain situation."  Because some of the documents in the bins allegedly were addressed to Plaintiff, Ms. Kerns suspected Plaintiff of involvement in the Iron Mountain situation.  On November 21, 2008, a meeting took place between Plaintiff, Ms. Kerns, and Jennifer Reese, a member of Defendants' Human Resources Department, wherein Ms. Kerns alleged that Plaintiff had placed mail in the recycling bin.  Compl. at ¶¶ 19-20.  As a result, Plaintiff was placed on a paid leave of absence pending investigation by Defendants.  Dep. Catullo, Defs.' Br., Ex. C.1, 178.  On December 11, 2008, Ms. Kerns, Ms. Reese, and Plaintiff met again.  Compl. at ¶ 28.  Plaintiff was asked "only general questions about how she handled her cases and her mail."  Id. at ¶ 29.  On December 19, 2008, Plaintiff attended a meeting with Ms. Reese and Kevin Rawlins, an Assistant Manager at Liberty Mutual, who informed Plaintiff that she was being terminated for misconduct and would not receive a severance package.  Id. at ¶ 34.  At the time of her termination, Plaintiff was 59 years old and had worked at Liberty Mutual for a little over ten years.  Plaintiff alleges that, upon her termination, her duties were "assumed by Liberty Mutual employees younger than [Plaintiff]."  Id. at ¶ 55.

Plaintiff alleges that she was treated in a disparate manner—including not being promoted, and being transferred from the PIP Litigation to the PIP medical unit—because of her age, and terminated because of her age, in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 et seq.  Plaintiff also brings a claim against Defendants for intentional infliction of emotional distress.  Because Defendant has marked

3

several exhibits submitted to the Court as "confidential," Plaintiff also moves to seal those exhibits.

## II. STANDARD

### A. Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party satisfies this initial burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear

the burden of proof at trial." Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the factfinder, not the district court.  BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**B. Motion to Seal**

Local Civil Rule 5.3 governs requests to seal documents filed with the Court.  Under Rule 5.3(c)(2), a party seeking to seal documents must show: (1) the nature of the materials at issue; (2) the legitimate private or public interests which warrant the relief sought; (3) the injury that would result if the relief sought is not granted; and (4) why a less restrictive alternative to relief sought is not available.  In turn, any order or opinion on a motion to seal must make findings as to those factors. L. Civ. R. 5.3(c)(5).  Additionally, where a party moves to seal pretrial motions of a "nondiscovery nature, the moving party must make a showing sufficient to overcome a 'presumptive right of public access.'"  Leucadia v. Applied Extrusion Tech., Inc., 998 F.2d 157, 164 (3d Cir. 1993). To overcome that presumption, a party must demonstrate that "good cause" exists for the protection of the material at issue.

Good cause exists when a party makes a particularized showing that disclosure will cause a "clearly defined and serious injury to the party seeking closure." Pansy v. Borough of

Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) (citations omitted); see Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995). A party does not establish good cause by merely providing "'broad allegations of harm, unsubstantiated by specific examples of articulated reasoning.'" Pansy, 23 F.3d at 786 (quoting Cipollone v. Liggett Grp., 785 F.2d 1108, 1121 (3d Cir. 1986)). To prevail, the parties must make this good cause showing with respect to each document sought to be sealed. Id. at 786-87.

### III.  DISCUSSION

#### A. Claims Under NJLAD

The NJLAD states, in pertinent part, that it is unlawful "[f]or an employer, because of the . . . age . . . of any individual . . . to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual . . . ." N.J.S.A. 10:5-12(a). The NJLAD's goal is the "eradication of the cancer of discrimination." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 867 A.2d 1133, 1138 (N.J. 2005) (quoting Jackson v. Concord Co., 54 N.J. 113, 253 A.2d 793, 799 (N.J. 1969)). Because it is a remedial statute, it should be read broadly to achieve its aims. Zive, 867 A.2d at 1138 (quoting Franek v. Tomahawk Lake Resort, 333 N.J. Super. 206, 754 A.2d 1237, 1243 (N.J. Super. Ct. App. Div. 2000)).

Plaintiff brings this age discrimination suit under a disparate treatment theory, wherein an employer treats some individuals less favorably than others because of a protected characteristic, such as race or age. Id. (citing Int'l Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977)). Proof of the employer's discriminatory motive is required. Id.

Because it is often difficult to find direct proof of discrimination in alleged disparate treatment situations, New Jersey has adopted the procedural burden-shifting methodology articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L.

Ed. 2d 668 (1973). This framework allows a plaintiff to prove discrimination through circumstantial evidence. Zive, 867 A.2d at 1139. Because Plaintiff has not offered direct evidence of Defendants' allegedly discriminatory acts, the matter before the Court is based on circumstantial evidence and must be evaluated under the McDonnell Douglas burden-shifting framework. See, e.g., Dep. Catullo, Defs.' Br., Ex. C.1, 223-24 ("Q: [D]id Lisa [Kerns] ever make any statements to you regarding your age in any regard? A: She didn't make any statements regarding my age. Q: Did Jen Reese make any statements with you at this meeting regarding your age in that regard?" A: No, they wouldn't have made those statements.").

Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination. Zive, 867 A.2d at 1139. Once established, an inference of discrimination is created and "the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action." Id. at 1140. If the employer meets this requirement, the burden then shifts back to the plaintiff to demonstrate that "the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision." Id.

In employment discrimination claims, the plaintiff bears the burden of proving the elements of the prima facie case. Victor v. State, 203 N.J. 383, 4 A.3d 126, 140 (N.J. 2010). This constitutes a "rather modest" burden and is meant to "demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent." Henry v. New Jersey Dept. of Human Services, 204 N.J. 320, 9 A.3d 882, 889 (N.J. 2010); Zive, 867 A.2d at 1139. To determine whether a plaintiff meets this burden, the Court begins by looking for the elements of the applicable prima facie case. When evaluating the validity of a plaintiff's prima facie case, the court is to look solely at the evidence presented by the plaintiff, regardless of defendant's

7

claims to the contrary. Zive, 867 A.2d at 1139. There is no single prima facie case that applies to all employment discrimination claims, as the specific elements depend upon the particular cause of action. Victor, 4 A.3d at 141.

        1. Wrongful Termination

In order to assert a prima facie case of age discrimination on the basis of wrongful termination under the NJLAD, a plaintiff must show that: (1) plaintiff was a member of a protected group; (2) plaintiff's job performance met the employer's legitimate expectations; (3) plaintiff was terminated; and (4) the employer replaced, or sought to replace, the plaintiff. Zive, 867 A.2d at 1141; Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 538 A.2d 794, 805 (N.J. 1988).

In this case, even if the Court assumes that Plaintiff has made out a prima facie case of wrongful termination, application of the McDonnell Douglas test requires that summary judgment be awarded to Defendants. Defendants have presented a legitimate, nondiscriminatory reason for Plaintiff's termination—namely, that Plaintiff's supervisor believed Plaintiff to be improperly discarding mail. Plaintiff argues that this reason is pretextual, and that the real reason behind the adverse employment actions is Defendants' discriminatory animus. However, as Plaintiff has presented neither direct nor circumstantial evidence of age discrimination on the part of Defendants, the Court cannot find that Plaintiffs have raised a genuine issue of material fact that Defendants' legitimate, nondiscriminatory reason is pretextual.

Where, as here, the employer has proffered a legitimate, nondiscriminatory reason for its action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.

1994); Sheridan v. E.I. Dupont de Nemours & Co., 100 F.3d 1061 at 1067.  To demonstrate pretext, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"  Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)).  Plaintiff must demonstrate at trial "both that the reason was false, and that discrimination was the real reason" for the unfavorable employment decision.  Fuentes, 32 F.3d at 763 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993).

Plaintiff expends significant effort attempting to demonstrate that she did not have involvement in the Iron Mountain incident, and that Ms. Kerns framed her in order to mask her discriminatory reasons for terminating Plaintiff.  See, e.g., Pl.'s Br. Opp., 4 ("Kerns was assigned to do an investigation [of the Iron Mountain situation], but she merely claimed falsely that twenty of the documents found in the bin 'were addressed to Catullo.'").  However, without any evidence of Ms. Kerns's alleged animus, Plaintiff's perception that Ms. Kerns negligently or even intentionally conducted a sham investigation of Plaintiff's suspected role in the Iron Mountain incident is not sufficient to demonstrate that Defendants' proffered legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual.  As the Third Circuit emphasized in Fuentes, an employment discrimination plaintiff must show not only that the defendant employer's supposed legitimate nondiscriminatory reason was false, but also that "discrimination was the real reason" for termination.  Fuentes, 32 F.3d at 763.  Plaintiff has not made such a showing.

Plaintiff explains her allegations of discriminatory treatment only through her own subjective opinion that age discrimination existed at Defendants' Marlton office.  She reports

9

feeling as though "every time there were layoffs . . . if just seemed like there were older workers that were involved in it, and people that had been there for a long time and had always been really good employees, but all of a sudden they became not good." Dep. Catullo, Defs.' Br., Ex. C.1, 163.  Plaintiff does argue that there was talk "in the workplace . . . that would have led [her] to believe that Liberty Mutual, at least in the Marlton office, was discriminating against older workers."  Id. at 161.  However, the allegation of such murmurings is not supported by any other evidence in the record.  Plaintiff suggests that there was "a spreadsheet" that revealed that a disparate percentage of terminated employees were older, but this spreadsheet has not been produced.[1]  (Moreover, Plaintiff's claim of such gossip concerns a general reduction in force at the Marlton office that took place over a year before Plaintiff's termination).  Asked for the basis of her belief that "decisions made with respect to [her] employment at Liberty Mutual [that] were made on the basis of [her] age," Plaintiff responded, "Gut instinct.  It's a feeling.  I mean, I go from a really great employee . . . [to a] steady downfall, and it wasn't from lack of trying or anything.  So I just felt that they were looking to get rid of older workers."  Id. at 164-65.

However, Plaintiff does not point to direct or circumstantial evidence to support her "gut instinct."  Plaintiff explains that "no comments" were made to her through the end of 2008 "regarding [her] performance up to that time that would have led [her] to believe that you were being discriminated against because of your age[.]"  Dep. Catullo, Defs.' Br., Ex. C.2, 161.  Furthermore, Plaintiff has also indicated that neither Ms. Kerns nor Ms. Reese made any statements to Plaintiff regarding her age, and, moreover, Plaintiff testified that "they wouldn't have made those statements."  Id. at 223-24.

---

[11] Plaintiff may be referring to the spreadsheet appended to her opposition brief as Exhibit P.  However, as is explained in more detail infra, that spreadsheet does not meaningfully demonstrate that a higher percentage of older workers was terminated in 2007 or at any other time.

10

Of course, to sustain an employment discrimination claim, a plaintiff need not point to a blatantly discriminatory policy or statement on the part of a defendant employer. See Marzano v. Computer Science Corp., 91 F.3d 497, 507 (3d Cir. 1996) (identifying as exceptional those cases wherein "a plaintiff can produce the proverbial 'smoking gun'" of a discriminatory memorandum or other document). However, the law is clear that "[w]hat makes an employer's personnel action unlawful discrimination is the intent behind that action." Id. Plaintiff has produced a spreadsheet of Defendants' current and former employees that includes their birthdates, their termination dates (if they were terminated), and the reasons for their termination (if applicable). Pl.'s Br. Opp., Ex. P. However, this information cannot be meaningfully processed by the Court, as Plaintiff has failed to analyze it in any way. For example, Plaintiff does not present the percentage of Defendants' workforce that is comprised by older individuals, and Plaintiff does not offer information as to the percentage of these individuals who were terminated. Plaintiff offers a table indicating that, of eleven involuntary terminations in Defendants' Marlton, New Jersey office in 2009, eight of these individuals were over forty years old. Id. at Ex. Q. However, Plaintiff also offers a table of involuntary terminations in Defendants' Marlton, New Jersey office in 2007-08, which shows that, of twenty-nine such terminations, eighteen were of individuals who were under forty years old. Plaintiff offers no expert testimony to decipher what the significance of these—or any—figures would be. Without such analysis, the Court is at a loss to guess at the meaning of the figures before it. As the Third Circuit has explained, "[t]o prove causation through statistical evidence alone, the statistics must be 'of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. . . . Statistical disparities must be sufficiently substantial that they raise such an inference of

causation.'" Newark Branch, NAACP v. City of Bayonne, 134 F.3d 113, 121 (3d Cir. 1998) (quoting Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 994 (1988).[2]

Accordingly, the Court finds that Plaintiff has not offered any evidence of discriminatory intent to support her wrongful termination claim. Moreover, Defendants have presented evidence to substantiate their legitimate, nondiscriminatory reason for Plaintiff's termination. Specifically, Defendants highlight the fact that two other Liberty Mutual employees—Glenn Moorehead and Jen Bailey—were terminated on the same day as Plaintiff, also for allegedly participating in the Iron Mountain incident. Plaintiff has identified these two employees as being significantly younger than Plaintiff, with Mr. Moorehead in his twenties, and Ms. Bailey in her 30s. Dep. Catullo, Defs.' Br., Ex. C.1, 206.

2. Discriminatory Transfer

Plaintiff further alleges that her transfer from the PIP Litigation to the PIP medical unit, constituted an adverse employment action, because, according to Plaintiff, the Litigation unit was generally considered to be more prestigious. Dep. Catullo, Defs.' Br., Ex. C.1, 29 (" . . . [T]he perception in the claims department is that the litigation team is a very specialized team, and they are looked at . . . like higher end of the hierarchy, you know, and a PIP [medical] rep was just a PIP rep, you know."). However, Plaintiff concedes that the transfer did not result in reduced pay, reduced benefits, or a lesser title. Dep. Catullo, Defs.' Br., Ex. C.1., 29.

Nevertheless, the Court finds that Plaintiff's transfer to the medical unit could be considered an adverse employment action that would weigh in favor of a determination that a

---

[2] Defendants have also argued that, because Plaintiff brings this lawsuit on a disparate treatment—rather than disparate impact—theory, only Defendants' treatment of Plaintiff as an individual is relevant, and the spreadsheets presented to the Court are therefore irrelevant. Defs.' Reply Br., 12-13. However, the Third Circuit has held that "[e]mployment discrimination plaintiffs are not precluded from introducing statistical evidence as circumstantial evidence of discrimination in a disparate treatment case." Abrams v. Lightolier Inc., 50 F.3d 1204, 1217 (3d Cir. 1995). Nevertheless, for the reasons expressed above, the Court finds that Plaintiff's spreadsheets do not offer information that substantiates her claims.

prima facie case of discriminatory transfer exists.  However, as with Plaintiff's wrongful termination claim, Defendants' summary judgment argument will succeed even if a prima facie case of discriminatory transfer is made out, because Defendants have offered a legitimate, nondiscriminatory reason for Plaintiff's transfer, and Plaintiff has not offered any evidence to show that that reason was pretextual.  Defendants explained that Plaintiff's supervisor in PIP Litigation, Kendra Goodwin, was concerned about Plaintiff's difficulty in meeting deadlines, and wanted to find a position for her at Liberty Mutual that would allow her to perform better.  See Defs.' Br., 8.  Moreover, it appears to have been documented throughout her tenure in PIP Litigation that, although Plaintiff's performance evaluations contained positive feedback, they also expressed that "Pat must strive to address her litigated assignment in a more timely manner" (2004 review), and, one year later, that "[l]itigation assignment backlog is still a major issue" (2005 review).   Dep. Catullo, Defs.' Br., Ex. C.1, 70, 79.

      Plaintiff acknowledges that, in the medical unit to which she was transferred, the work was "less time sensitive" than in PIP Litigation, such that "it would have been easier to manage the timely handling of claims in PIP claims versus PIP litigation[.]" Dep. Catullo, Defs.' Br., Ex. C.1, 96.  Ms. Kerns also testified that "Pat was struggling in the litigation role in terms of time frame requirements and management of her activities, and I felt that [the transfer to the medical unit] would be an opportunity for her to get back into a role that she had been in before."  Dep. Kerns, Defs.' Br., Ex. C.2, 60.  Accordingly, the Court finds that Defendants have presented a legitimate, nondiscriminatory reason for Plaintiff's transfer to the medical claims unit.

      As with Plaintiff's wrongful termination claim, no evidence has been presented that age discrimination, and not Plaintiff's work limitations, was the true motivation behind Plaintiff's transfer—or, indeed, that such animus was even a factor in the decision to transfer Plaintiff.

Plaintiff's deposition clarifies that her supervisors did not intimate that age was in any way involved in her transfer. See Dep. Catullo, Defs.' Br., Ex. C.1, 31 (Q: "Did either Lisa Kerns or Kendra indicate to you that one of the reasons that you were being transferred had anything to do with your age? A: No. Q: Besides those two, has anyone at Liberty Mutual ever indicated to you that the decision to transfer you to the PIP unit had anything to do with your age at the time of the transfer? A: No."). Because Plaintiff presents no evidence to support the contention that Defendants' proffered reason for her transfer from PIP Litigation was pretextual, Plaintiff has not raised a factual dispute for trial as to her discriminatory transfer claim.

### 3. Failure to Promote

Plaintiff also contends that Defendants' failure to promote her constituted an adverse employment action. To make out a prima facie case of age discrimination in a failure-to-promote case, the plaintiff must show the following: (1) she is a member of a class protected by anti-discrimination laws; (2) she was qualified for the position or rank; (3) she was denied promotion, reappointment, or tenure; and (4) others with similar or lesser qualifications achieved that rank or position. Greenberg v. Camden County Vocational & Tech. Schools, 310 N.J. Super. 189, 708 A.2d 460, 465 (N.J. Super. Ct. App. Div. 1998) (citing Dixon v. Rutgers, 110 N.J. 432, 541 A.2d 1046 (N.J. 1988)).

Defendants appear to argue that, because Plaintiff never applied for a promotion, Plaintiff was not "denied" a promotion and does not have an actionable failure-to-promote claim. However, Liberty Mutual did not have a formal process by which employees could apply for a promotion. Dep. Kerns, Defs.' Br., Ex. C.2, 123 ("Q: So at Liberty Mutual . . . [i]s it your understanding that the initiative for a promotion always comes from the supervisor? A: As far as I know."). "Although some courts have held that failure to apply for a promotion is fatal to a

14

failure to promote claim, many courts have overlooked this failure in certain cases, such as when the promotional system did not involve a formal application process . . . ." Khair v. Campbell Soup Co., 893 F. Supp. 316, 331-32 (D.N.J. 1995) (citing Larson, Employment Discrimination § 8.02[2], at 8-25 to 27).  Accordingly, in this case, where no formal promotion application process existed, Plaintiff's failure-to-promote claim is not necessarily defeated because Plaintiff did not apply for the promotion.

However, the Court finds that, even if a prima facie case of Defendants' failure to promote Plaintiff were made out, Defendants have put forth a legitimate, nondiscriminatory reason as to why Plaintiff was not promoted—namely, that Plaintiff had trouble keeping up with the pace of her work and, as a result, the quality of Plaintiff's work declined.  This is documented in Plaintiff's annual performance evaluations.  Moreover, as with the Plaintiff's wrongful termination and discriminatory transfer claims, Plaintiff has not offered any evidence to suggest that Defendants manufactured the documented decline in Plaintiff's performance because Defendants discriminated against her on the basis of her age.  Thus the Court finds that Plaintiff has not made any showing of Defendants' animus, such that Defendants' legitimate, nondiscriminatory reason would be considered pretextual by a jury, and the Court finds that summary judgment for Defendants is appropriate on this claim.

### B. Intentional Infliction of Emotional Distress

Plaintiff's Complaint presents a claim of intentional infliction of emotional distress ("IIED").  Compl. ¶¶ 64-66.  Defendants' brief does not present legal or factual argument specifically addressed Plaintiff's intentional infliction of emotional distress claim.  However, because Defendants have moved for summary judgment on all claims, the Court addresses the merits of Plaintiff's IIED claim.

"In order to prevail on [a] common law claim [for intentional infliction of emotional distress], 'the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe.'" Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 969 A.2d 1097, 1115 (N.J. 2009). To demonstrate that conduct is sufficiently "extreme and outrageous" the plaintiff must prove that it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 544 A.2d 857, 863 (N.J. 1988) (quoting Restatement (Second) of Torts, § 46 cmt. d (1965)). Allegations of mere "aggravation, embarrassment, and an unspecified number of headaches, and loss of sleep" are insufficient. Id. at 864. "[T]he emotional stress suffered by the plaintiff must be 'so severe that no reasonable man could be expected to ensure it.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. j (1965)).

Here, Plaintiff identifies the following conduct by Defendants as "outrageous," such that IIED may be found: "treating [Ms. Catullo] less favorably because of her age, refusing to advise Catullo of the specific charges against her at the time of her suspension, failing to respond to Catullo's inquiries concerning her employment situation, and forcing Catullo to attend a meeting after Catullo had been suspended three weeks and still refusing to inform Catullo of the specific charges against her." Compl. ¶ 65. Plaintiff's allegations do not meet the high standard for IIED set out in New Jersey case law. New Jersey courts hold that it is "extremely rare to find conduct in the employment context that" rises to the level of outrageousness necessary. Griffin v. Tops Appliance City, Inc., 337 N.J. Super. 15, 766 A.2d 292, 297 (App. Div. 2001). "[W]hile loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide a basis for recovery for infliction of emotional distress." Id. Likewise,

in this case, although Plaintiff claims hardship as a result of her termination and the events leading up to it, that hardship is not so uncommon that it can properly be deemed "outrageous." Accordingly, the Court grants summary judgment to Defendants as to Plaintiff's claim for intentional infliction of emotional distress.

### C. Motion to Seal

Plaintiff has moved to seal the following documents, which have been designated by Defendants as "confidential": (1) Materials from Lisa Kerns's personnel file, Pl.'s Br. Opp., Ex. J; (2) Defendants' 2007 review for Rita Thompson, Pl.'s Br. Opp., Ex. K; and (3) Materials from Peggy Carter's personnel file, Pl.'s Br. Opp., Ex. L. Although these documents do contain information about employees other than Plaintiff, Plaintiff has not offered any evidence or argument of the harm that will arise if the documents in question are not sealed. Since the instant motion is a pretrial motion of a "nondiscovery nature," Plaintiff must make "a showing sufficient to overcome a 'presumptive right of public access.'" Leucadia v. Applied Extrusion Tech., Inc., 998 F.2d 157, 164 (3d Cir. 1993). Plaintiff has not made a showing of "clearly defined and serious injury to the party seeking closure," and therefore has not overcome the presumption of public access. Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) (citations omitted). Moreover, Plaintiff has not demonstrated why a less restrictive alternative to sealing the documents is not available.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. Plaintiff's motion to seal is **DENIED**. An accompanying order shall enter today.

Dated: 3/6/2012              /s/ Robert B. Kugler
                             ROBERT B. KUGLER
                             United States District Judge